**Len DOUCETTE, Donna Mendez, Cortland Bonds, Bonny Ann Dodd, Carol Roe, and John Doe, Plaintiffs,**

v.

**CITY OF SANTA MONICA and James T. Butts, Jr., Defendants.**

Civil Action No. 95–1136.

United States District Court,
C.D. California.

Feb. 6, 1997.

▮▮▮▮▮▮▮▮▮▮▮

Ronald McIntire, Mark Goldzweig & Karen Bray, of Perkins Coie; Susanne A. Griffin, of the National Lawyers Guild; Paul L. Freese, Jr., Public Counsel, Los Angeles, CA, for plaintiff.

Marsha Jones Moutrie, City Attorney for Santa Monica; Joseph Lawrence, Assistant City Attorney, Santa Monica, for defendant.

## ORDER ON MOTION FOR SUMMARY ADJUDICATION

KELLER, District Judge.

Before the Court is a Motion for Summary Adjudication brought by plaintiffs Len Doucette ("Doucette"), Donna Mendez, Cortland Bonds, Bonny Ann Dodd, Carol Roe, and John Doe. The motion is opposed by defendants City of Santa Monica (the "City") and its Chief of Police James T. Butts, Jr. ("Butts"). In the underlying action, plaintiffs allege civil rights violations under 42 U.S.C. section 1983. Plaintiffs now move for summary adjudication of their sixth claim, which challenges the constitutionality of certain ordinances regulating solicitation in the City.

## BACKGROUND

Plaintiffs have brought a number of constitutional challenges to certain ordinances adopted by the City and enforced by Butts. Plaintiffs argue that the purpose and effect of these ordinances, as enforced, is to criminalize homelessness and banish the homeless from the City. Complaint ¶ 1. On behalf of a defined class of persons, plaintiffs seek a declaration of the unconstitutional nature of defendants' actions, a preliminary injunction against the enforcement of the ordinances against the homeless, and a declaration of the parties' rights and obligations, as well as ancillary damages, attorneys' fees, and costs. On behalf of a defined subclass of persons, plaintiffs seek compensatory damages for the loss of property allegedly sustained by members of the subclass as a result of the alleg-edly unconstitutional enforcement of the ordinances.

By this motion, plaintiffs challenge certain of the City's Municipal Code provisions regulating solicitation in the City. Plaintiffs challenge Ordinance No. 1758, codified at Santa Monica Municipal Code ("SMMC") ch. 4.08, § 4.08.750, as well as the solicitation provisions of Ordinance No. 1768, codified at SMMC ch. 4.54, §§ 4.54.010–4.54.040. Plaintiffs argue that these provisions violate the First Amendment to the United States Constitution. The City has not filed a cross-motion for summary adjudication, but requests summary adjudication in its opposition.

## DISCUSSION

Plaintiffs lack standing to challenge Ordinance 1758, but have standing to bring a facial challenge to the solicitation provisions of Ordinance 1768. This challenge fails. Even assuming that the provisions are analyzed under the high level of scrutiny applicable to restrictions on speech in a public forum, the provisions are narrowly tailored to serve the significant governmental interest of preventing harassment and intimidation, and the provisions leave open ample alternate channels for solicitation.

### I. Standing

▮▮▮ Defendants argue that plaintiffs lack standing. At an irreducible minimum, Article III of the Constitution requires a plaintiff "to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quotations and citations omitted). The actual or threatened injury must be real and immediate, rather than conjectural and hypothetical. *Casey v. Lewis*, 4 F.3d 1516, 1519 (9th Cir. 1993). In a class action suit, the inquiry is "whether any named plaintiff has demonstrated that he has sustained or is imminently in danger of sustaining a direct injury as the result of the challenged conduct." *Casey*, 4 F.3d at 1519. One who fails to meet

the requirements of Article III may not litigate in the federal courts. *Valley Forge,* 454 U.S. at 475–76, 102 S.Ct. at 760–61.

■ "In addition to the limitations on standing imposed by Article III's case-or-controversy requirement, there are prudential considerations that limit the challenges courts are willing to hear. The plaintiff generally must assert his own legal rights and interest, and cannot rest his claim to relief on the legal rights or interest of third parties." *Secretary of State of Maryland v. Munson,* 467 U.S. 947, 955, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1984). As plaintiffs note, these additional prudential limitations are not as rigorous where First Amendment speech rights are implicated. *Stoianoff v. Montana,* 695 F.2d 1214, 1223 (9th Cir.1983). "In such cases, a plaintiff may assert the constitutional rights of others under the relaxed standards for overbreadth facial challenges involving protected speech." *Id.* Thus, a plaintiff may challenge a statute as overbroad even if the state could regulate the plaintiff's conduct with a more narrowly drawn statute. *Broadrick v. Oklahoma,* 413 U.S. 601, 612–13, 93 S.Ct. 2908, 2915–16, 37 L.Ed.2d 830 (1973). Accordingly, even if the challenged provisions may be valid as applied to plaintiffs, that is not fatal to plaintiffs' argument that the provisions are overbroad.[1]

■ However, the fact that the Supreme Court has relaxed the prudential standing requirement that parties must assert their own rights does not mean that such parties are excused from the Article III requirement that the plaintiff have suffered an actual or threatened injury. *Bordell v. General Elec. Co.,* 922 F.2d 1057, 1061 (2d Cir.1991). Thus, even a plaintiff bringing a facial challenge to an ordinance on First Amendment grounds has standing only if he can demonstrate some actual or threatened injury to himself. *Id.; see also Munson,* 467 U.S. at 958, 104 S.Ct.

at 2847–48 (plaintiff bringing an overbreadth challenge must have suffered an injury-in-fact); *Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760 (satisfaction of prudential standing principles cannot substitute for a demonstration of actual or threatened injury).

■ Although a plaintiff challenging a criminal statute need not actually be arrested or prosecuted in order to show an actual or threatened injury, *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), such a plaintiff generally has standing only if he "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder," *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2309, 60 L.Ed.2d 895 (1979). In the First Amendment context this rule is sometimes relaxed, allowing plaintiffs to achieve standing in part by arguing that the existence of a law regulating speech has deterred them from engaging in First Amendment activity. *See Adult Video Ass'n v. Barr,* 960 F.2d 781, 785 (9th Cir.1992), *vacated on other grounds,* 509 U.S. 917, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993); *Ripplinger v. Collins,* 868 F.2d 1043, 1047 (9th Cir.1989); *Polykoff v. Collins,* 816 F.2d 1326, 1331 (9th Cir.1987).

■ Where a plaintiff argues that he is harmed by the chilling of his speech, he is still "required to show that he is seriously interested in subjecting himself to, and the defendant seriously intent on enforcing, the challenged measure." *NAACP v. City of Richmond,* 743 F.2d 1346, 1351 (9th Cir. 1984). As a result, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972). "Rather, to

1. The general rule in constitutional adjudication is that a person who has engaged in activity that is not constitutionally protected cannot complain that the statute is unconstitutional as applied to others. Such a "facial" challenge is generally rejected for prudential reasons. *E.g. United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522–23, 4 L.Ed.2d 524 (1960). However, courts' "ordinary reluctance to entertain facial chal-

lenges is somewhat diminished in the First Amendment context" because of the "concern that those who desire to engage in legally protected expression may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." *Roulette v. City of Seattle,* 78 F.3d 1425, 1427 (9th Cir.1996) (citations and quotations omitted).

establish standing in this manner, a plaintiff must proffer some objective evidence to substantiate his claim that the challenged [ordinance] has deterred him from engaging in protected activity." *Bordell,* 922 F.2d at 1061. The question is how likely it is that the government will attempt to use the challenged provisions against the plaintiff, not merely how much the prospect of enforcement worries the plaintiff. *See American Library Ass'n v. Barr,* 956 F.2d 1178, 1193 (D.C.Cir.1992).

■ Objective evidence of deterrence is most often shown by evidence that others engaging in the activity have been prosecuted. *See, e.g., Adult Video Ass'n,* 960 F.2d at 785; *Ripplinger,* 868 F.2d at 1047; *Polykoff,* 816 F.2d at 1331. If the plaintiff shows that the government is actively enforcing the law against persons engaged in the regulated activity, the plaintiff bolsters his contention that he would face a reasonable threat of prosecution if he were to engage in the proscribed activity. *See Adult Video Ass'n,* 960 F.2d at 785; *Ripplinger,* 868 F.2d at 1047; *Polykoff,* 816 F.2d at 1331. This gives credence to the allegation of a chilling effect. By contrast, when there is no indication that the government has an immediate intent to prosecute protected conduct or speech, and the plaintiff has failed to allege even a desire to engage in such conduct or speech, that plaintiff lacks standing even if he alleges that his speech has been chilled. *See American–Arab Anti–Discrimination Committee v. Thornburgh,* 970 F.2d 501, 510 (9th Cir.1991) (even if organization's members were discouraged, organization had no standing absent proof that its members would be subject to deportation under challenged statute).

■ At least one plaintiff has introduced a declaration which raises a threat of specific future harm under certain of the challenged regulations. Plaintiff Len Doucette "actively seeks donations from individuals to fund his newspaper, *Hard Times,* and

to pay for the necessities of life." Reply at 2. In addition, Doucette distributes copies of the newspaper in return for donations. Second Doucette Declaration at ¶ 1.[2] He has alleged that his activities in this regard have been, and will continue to be, deterred by the prospect of the challenged ordinances being enforced against him. *Id.* at ¶¶ 2–3.

The City has not disavowed an intention to prosecute persons under Ordinance 1768, and indeed has submitted evidence that persons have been prosecuted under that ordinance recently. Moutrie Decl. ¶ 10. The Court concludes that Doucette may be chilled from engaging in certain conduct as a result of Ordinance 1768, based upon a well-founded fear that he will be prosecuted if he continues to engage in such conduct. *See Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 393, 108 S.Ct. 636, 643, 98 L.Ed.2d 782 (1988). Thus, the Court will consider Doucette's challenge to the solicitation provisions of Ordinance 1768, contained at SMMC §§ 4.54.010–4.54.040.

■ However, the Court concludes that plaintiffs lack standing to challenge Ordinance 1758, codified at SMMC § 4.08.750. The City Attorney has stated that the City is no longer enforcing Ordinance 1758. Moutrie Decl. ¶ 10. This does not appear to be a tactical decision made to avoid litigation, as the City is actively enforcing similar provisions contained in Ordinance 1768. Indeed, during the six-month period ending on December 31, 1995, there were five misdemeanor prosecutions involving alleged violations of solicitation ordinances, all of which were brought pursuant to the solicitation provisions of Ordinance 1768. *Id.* Because the City has disavowed its enforcement for nontactical reasons, plaintiffs have failed to demonstrate that they have standing to challenge Ordinance 1758. *See American–Arab,* 970 F.2d at 510; *Younger v. Harris,* 401 U.S. 37, 42, 91 S.Ct. 746, 749, 27 L.Ed.2d 669 (1971)

---

**2.** Defendants argue that, because Doucette "sells" his newspaper, his activities constitute commercial solicitation, and therefore fall outside the scope of the challenged regulations. However, SMMC § 4.54.020(b) defines "donation" to include the "purchase of an item for an amount far exceeding its value under circum-

stances where a reasonable person would understand that the purchase is in substance a gift." The Court believes that those who purchase *Hard Times* understand that the purchase is in substance a gift; the declarations submitted by plaintiffs certainly support this understanding.

("persons having no fears of state prosecution except those that are imaginary and speculative" are not appropriate plaintiffs).

## II. Summary Judgment Standard Under Rule 56

Summary judgment is appropriate where there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. Where the non-moving party bears the ultimate burden of proof with respect to the dispositive issue, the movant discharges his burden by showing the absence of supporting evidence as to that issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to provide specific facts showing there are genuine issues for trial on the dispositive issue. *Celotex,* 477 U.S. at 323–25, 106 S.Ct. at 2552–54. All reasonable inferences are granted in favor of the non-moving party. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 323–25, 106 S.Ct. at 2552–54.

It is this Court's duty "to determine whether the 'specific facts' set forth by the non-moving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on the evidence." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir. 1987) (citation omitted). A "mere scintilla of evidence" is insufficient to oppose a summary judgment motion under Rule 56. *Anderson v. Liberty Lobby Co.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## III. Solicitation Provisions of Ordinance 1768

Ordinance 1768 contains numerous provisions regulating solicitation. These provisions are codified at SMMC ch. 4.54, §§ 4.54.010–4.54.040. Chapter 4.54 is entitled "Prohibition Against Abusive Solicitation." The stated purpose of the provisions is "to impose reasonable place and manner limitations on solicitation ... in order to protect the safety of the general public against abusive solicitation while respecting the constitutional right of free speech."

SMMC § 4.54.010. The definition of solicitation is restricted to requests made in person seeking an immediate donation of money or other items of value. SMMC § 4.54.020(a).

The challenged provisions include both manner restrictions and place restrictions on solicitation. The manner restrictions are contained in section 4.54.020, which defines what is considered "abusive" solicitation and therefore unlawful:

"Abusive solicitation" means to do one or more of the following while engaging in solicitation or immediately thereafter:

(1) Coming closer than three feet to the person solicited unless and until the person solicited indicates that he or she wishes to make a donation;

(2) Blocking or impeding the passage of the person solicited;

(3) Following the person solicited by proceeding behind, ahead or alongside him or her after the person solicited declines to make a donation;

(4) Threatening the person solicited with physical harm by word or gesture;

(5) Abusing the person solicited with words which are offensive and inherently likely to provoke an immediate violent reaction;

(6) Touching the solicited person without the solicited person's consent; or

(7) Engaging in solicitation activity in any of the prohibited places specified in Section 4.54.030.

Section 4.54.030 sets place restrictions on solicitation, prohibiting solicitation in the following locations:

(a) Bus stops;

(b) Public transportation vehicles or facilities;

(c) A vehicle on public streets or alleyways;

(d) Public parking lots or structures;

(e) Outdoor dining areas of restaurants or other dining establishments serving food for immediate consumption;

(f) Within fifty feet of an automated teller machine; or

(g) A queue of five or more persons waiting to gain admission to a place or vehicle, or waiting to purchase an item or admission ticket.

Violation of any of these restrictions is punishable by imprisonment of not more than six months and a fine not to exceed five hundred dollars. SMMC § 4.54.040.

## IV. Place Restrictions

 As a preliminary matter, it is well-settled that solicitation, including solicitation for money, is protected by the First Amendment. *E.g. United States v. Kokinda,* 497 U.S. 720, 725, 110 S.Ct. 3115, 3118, 111 L.Ed.2d 571 (1990) ("Solicitation is a form of speech recognized by the First Amendment"). However, "[t]he degree of protection afforded to an interest within the scope of the First Amendment depends in substantial part upon the forum in which the activity is pursued." *ACORN v. City of Phoenix,* 798 F.2d 1260, 1264 (9th Cir.1986). Thus, the analysis of the constitutionality of the place restrictions contained in Ordinance 1768 must begin with an examination of where speech is restricted by the challenged provisions.

### A. Forum–Based Analysis

 Public property is divided into three broad categories for First Amendment purposes. The first category comprises traditional public fora: places which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Committee for Indus. Org.,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). A traditional public forum has as a principal purpose the free exchange of ideas. *International Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 679, 112 S.Ct. 2701, 2705–06, 120 L.Ed.2d 541 (1992). Sidewalks, streets, and parks have been recognized as traditional public fora, which have by long tradition been devoted to assembly and debate. *ACORN,* 798 F.2d at 1264. The government's ability to restrict speech in such places is severely limited. *See United States*

*v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1706–07, 75 L.Ed.2d 736 (1983).

 A second category of public property consists of property which, although not traditionally a place for public discussion, the government has opened for use by the public as a place for expressive activity. This category includes sites such as state university facilities that the government has intentionally made available for the activities of registered student groups. *See Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). A government does not create such a public forum by inaction; the decision to create a public forum must be made "by intentionally opening a nontraditional forum for public discourse." *Cornelius v. NAACP Legal Defense and Ed. Fund,* 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985). "Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry Education Assoc. v. Perry Local Educators' Assoc.,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

 The final category of public property consists of all public property not included in the first two categories, and embraces places such as metropolitan airports. *See Lee,* 505 U.S. at 680, 112 S.Ct. at 2706. A regulation with respect to such property "need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Id.* at 678–79, 112 S.Ct. at 2705. The regulation need not be "the most reasonable or the only reasonable limitation." *Cornelius,* 473 U.S. at 808, 105 S.Ct. at 3452.

The challenged provisions in this case appear to restrict speech in both public and non-public places. Some of the restrictions govern areas which clearly are not public fora. For instance, public parking lots or structures are not traditional locations of expressive activity, and plaintiffs have not suggested that they have been intentionally opened for such activity. *See Lee,* 505 U.S. at 680, 112 S.Ct. at 2706. The same reason-

ing may apply to certain public transportation vehicles and facilities. *See id.*

 Other locations covered by the regulations may be public fora, such as: bus stops; outdoor dining areas of restaurants or other dining establishments serving food for immediate consumption; places within 50 feet of an automated teller machine; and queues of five or more persons waiting to gain admission to a place or vehicle or waiting to purchase an item or ticket. It is true that the character of these locations is not obvious on its face, and the parties have submitted no evidence as to their character. Even absent such evidence, however, it is obvious that at least some of the places regulated are located on sidewalks, which themselves are generally considered to be traditional public sites.[3]

Since it is clear that the challenged provisions will have some, as yet undefined, application to areas traditionally considered public, the Court treats the challenged provisions as restricting speech in public fora. However, resolution of the forum issue is not essential to the constitutional analysis, because the provisions pass muster even under the stricter standards applicable to public fora.

 In this connection, the Court notes that not all public places are alike. Even as to public fora, the nature of the particular forum may affect the balancing of governmental and speech interests. In particular, certain governmental objectives may take on a greater significance in one public location than in another. *See Heffron v. International Soc'y for Krishna Consciousness,* 452 U.S. 640, 650–51, 101 S.Ct. 2559, 2565–66, 69 L.Ed.2d 298 (1981). For example, restrictions on soliciting on public streets may be justified by concerns about traffic flow and safety. *ACORN,* 798 F.2d at 1270. These considerations are relevant to the discussion which follows.

### B. Time, Place, or Manner Analysis

 Ordinance No. 1768 does not ban the solicitation of contributions altogether, but rather regulates the places and manner in which such solicitation may occur. Moreover, the City does not restrict other forms of communication, such as oral advocacy or the distribution of literature. The ordinance is accordingly analyzed as a form of time, place or manner regulation. *ACORN,* 798 F.2d at 1267. In assessing the constitutionality of a regulation that limits the time, place or manner of speech in a public forum, a court must first determine whether the statute is content-neutral or content-based. *See Tollis, Inc. v. San Bernardino County,* 827 F.2d 1329, 1332 (9th Cir.1987). If it is content-based, the court applies strict scrutiny to determine whether the statute is tailored to "serve a compelling state interest and is narrowly drawn to achieve that end." *Simon & Schuster, Inc. v. New York Crime Victims Bd.,* 502 U.S. 105, 118, 112 S.Ct. 501, 509, 116 L.Ed.2d 476 (1991) (quotation omitted). However, if the statute is content-neutral, the government may enforce its rules provided that they (1) are narrowly tailored to serve a significant governmental interest, and (2) leave open ample alternative channels for communicating the information. *Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55.[4]

---

3. The restriction on soliciting from a person in a vehicle on public streets or alleyways presents a unique issue. Streets are generally considered to be quintessential traditional public fora. *E.g. Frisby v. Schultz,* 487 U.S. 474, 481, 108 S.Ct. 2495, 2500–01, 101 L.Ed.2d 420 (1988). However, the Ninth Circuit has considered the "novel argument that streets are not public fora while simultaneously in use by motor vehicles." *ACORN,* 798 F.2d at 1267. The panel observed: "[T]o conclude that streets may generally be categorized as traditional public fora may not require us to also conclude that the streets at all times and under all circumstances are susceptible to characterization as a perpetual public forum uniquely available for free expression." *ACORN,* 798 F.2d at 1266.

Despite this observation, the Ninth Circuit refused to intimate any view as to when streets are deprived of public forum status by the flow of motor vehicles. Consistent with the traditional view, this Court treats streets as public fora, despite indications to the contrary in *ACORN.*

4. The restrictions could be analyzed under *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), which sets forth the appropriate framework for the review of a regulation of expressive conduct. However, because the challenged provisions govern solicitation only when a "request" for money is directed at a specific person, it is appropriate to apply the time, place, and manner test for restrictions on speech. In any case, the *O'Brien* test is al-

### 1. The challenged provisions are not content-based

A speech restriction is content-neutral if it is "justified without reference to the content of the regulated speech." *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989). "A regulation that serves purposes unrelated to the content of the expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791, 109 S.Ct. at 2754.

Regulations of solicitation have repeatedly been found content-neutral. *See, e.g., United States v. Kokinda*, 497 U.S. 720, 736, 110 S.Ct. 3115, 3124–25, 111 L.Ed.2d 571 (1990); *Heffron*, 452 U.S. at 649, 101 S.Ct. at 2564–65; *ACORN*, 798 F.2d at 1267; *ISKCON of Potomac, Inc. v. Kennedy*, 61 F.3d 949, 954–58 (D.C.Cir.1995). A restriction on solicitation may be content-neutral even if it regulates solicitation while leaving other types of speech untouched, because the regulation focuses on the inherently disruptive nature of solicitation itself, and not on the content of the speech. *Kokinda*, 497 U.S. at 736, 110 S.Ct. at 3124–25. This is true even though it could be argued that solicitation is more disruptive only because of its content and the attendant reactions that such content provokes. *See Kokinda*, 497 U.S. at 754, 110 S.Ct. at 3134 (Brennan, J., dissenting). The challenged provisions in this case appear to be content-neutral, as they "appl[y] evenhandedly to every organization or individual, regardless of viewpoint, which would desire to solicit contributions." *ACORN*, 798 F.2d at 1267; *see also Heffron*, 452 U.S. at 649, 101 S.Ct. at 2564 (rule is content-neutral that "applies evenhandedly to all who wish to distribute and sell written materials or to solicit funds").

Plaintiffs contend that the challenged provisions, directed as they are at solicitation, were in fact passed to target the homeless. According to the ordinance, the solicitation provisions were passed to limit panhandling or "similar solicitation activity." *See* Ordinance 1768 at ¶¶ 11–12. Although this statement reveals a desire to regulate intimidating solicitation, it does not indicate that the challenged provisions arise from a disagreement on the part of the City with the message conveyed by homeless people, or with the ability of homeless people to speak in general.

Plaintiffs next argue that, even if the challenged provisions could validly regulate solicitation in general, they discriminate on the basis of content because they govern only the solicitation of donations and not the solicitation of sales. Motion at 10 n. 3. At first glance, this appears to be a substantial argument. Cases that have allowed regulations of solicitation have generally addressed regulations covering solicitation of both donations and sales. *E.g. Heffron*, 452 U.S. at 643, 101 S.Ct. at 2561–62; *Lee*, 505 U.S. at 675–76, 112 S.Ct. at 2703–04. A city may not distinguish between commercial and noncommercial speech if both are equally responsible for the problems the city seeks to alleviate. *Metromedia Inc. v. San Diego*, 453 U.S. 490, 513, 101 S.Ct. at 2882, 2895, 69 L.Ed.2d 800 (1981) (plurality opinion); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 430, 113 S.Ct. 1505, 1517, 123 L.Ed.2d 99 (1993) (ordinance distinguishing between commercial and noncommercial speech is content-based absent a neutral justification for differential treatment).

However, the underinclusiveness of a speech regulation has been found to be impermissible only in two narrow circumstances. *See ISKCON*, 61 F.3d at 956–57. First, where a regulation's underinclusiveness indicates that it is intended to give one side of a debate an advantage over the other, the regulation will be found to be content-

most identical to the time, place, and manner test. *See Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 298, 104 S.Ct. 3065, 3071, 82 L.Ed.2d 221 (1984).

based and hence invalid. *See City of Ladue v. Gilleo*, 512 U.S. 43, 50–52, 114 S.Ct. 2038, 2043, 129 L.Ed.2d 36 (1994). Plaintiffs argue that the mere fact that the challenged regulations do not govern commercial solicitation indicates that they are not content-neutral.

A similar argument was rejected in *ISKCON*, *supra*, a case involving a National Park Service ban on all "in-person solicitation of immediate donations" in certain national parks in the Washington, D.C. area. *ISKCON*, 61 F.3d at 955. The Court of Appeals for the District of Columbia noted that the challenged regulations construed "solicitation" to include "only an in-person request for immediate payment," and therefore left plaintiffs free to "distribute leaflets soliciting donations with instructions about where to send them." *Id.* at 954. Since the regulation did not "totally prohibit a type of expression or a specific message," but "merely regulate[d] the manner in which the message [could] be conveyed," the court found it to be content-neutral. *Id.* at 955.

Like the regulation at issue in *ISKCON*, the City's regulations are restricted to requests made "in person seeking an immediate donation of money or other item of value …" SMMC § 4.54.020(a). Moreover, the City's regulations leave open even more avenues for solicitation than did the regulations at issue in *ISKCON;* whereas the latter banned virtually all solicitation activity in all areas of the parks, the City's place restrictions bar solicitation only in a few well-defined areas. Finally, plaintiffs have glossed over the fact that regulations of "general" solicitation (*i.e.*, regulations which govern donative and commercial solicitation together) have, as stated above, repeatedly been found content-neutral. They fail to explain why regulations that draw distinctions based on the character of the solicitation are not likewise content-neutral, when those distinctions are not based on any message conveyed in the particular form of solicitation.

Since plaintiffs have submitted no evidence which indicates that the City disagrees with the message assertedly advanced by panhandlers or other in-person solicitors of donations, defendants cannot be seen as attempting to advance or restrict any viewpoint or discriminate on the basis of content.

■■■ The second circumstance in which the underinclusiveness of a speech regulation will render the regulation impermissible is where the nature of the underinclusiveness "diminish[es] the credibility of the government's rationale for restricting speech in the first place." *See City of Ladue*, 512 U.S. at 52, 114 S.Ct. at 2044 (citing *Discovery Network*, 507 U.S. at 418–27, 113 S.Ct. at 1510–16). This second consideration relates to whether the regulation is sufficiently tailored in light of the government's stated purposes, and accordingly is discussed below.

### 2. The challenged provisions are narrowly tailored to serve a significant governmental interest

■■■ When an ordinance is content-neutral, the government is not required to pursue the "least restrictive alternative" available. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest … the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800, 109 S.Ct. at 2758. Of course, the requirement of narrow tailoring is not a nullity, and the presence of obvious less-burdensome alternatives is relevant in determining whether there is a reasonable fit between ends and means. *See Discovery Network, Inc.*, 507 U.S. at 417 n. 13, 113 S.Ct. at 1510 n. 13.

#### a. Restriction on solicitation from motorists

■■■ The restriction on solicitation from motorists is similar to an ordinance that has been upheld by the Ninth Circuit. In *ACORN*, *supra*, the court upheld a statute making it unlawful for a person to stand on a street and solicit or attempt to solicit employment, business, or contributions from the occupants of any vehicle. The decision was based on the district court's factual finding that the mere presence of the plaintiff's representatives on the roadway was a potential safety hazard. *ACORN*, 798 F.2d at 1270.

"The distraction of motorists occasioned by solicitation not only threatens to impede the orderly flow of traffic, but also raises serious concerns of traffic and public safety." *Id.* at 1269. Plaintiffs have submitted no evidence that a similar safety hazard is not presented by solicitation from vehicles on public streets or alleyways in Santa Monica. Absent any such evidence, the only logical inference is that such a hazard is presented. Accordingly, under *ACORN*, the restriction on solicitation from motorists is constitutional.

### b. Other place restrictions

Turning to the other place restrictions, as in any time, place and manner analysis, the sufficiency of the tailoring of the remedy to the governmental interest depends upon the nature of the governmental interest asserted. The City points to the following interests: public safety and convenience; the orderly movement of traffic and pedestrians; the prevention of intimidating, threatening, and harassing conduct; and the aesthetics of public property. The City argues that Ordinance No. 1768 "only seek[s] to regulate locations peculiarly susceptible to theft and intimidation." Indeed, the stated purpose of the ordinance is "to protect the safety of the general public against abusive solicitation." SMMC § 4.54.010.

■ Some of the City's asserted interests are insufficient to justify the restrictions. For example, putting aside the restriction on solicitation from motorists, the legitimate interest in maintaining an orderly flow of pedestrians or traffic is not served by the place restrictions, which do not appear to be targeted at areas where traffic flow is of significant importance.

■ However, the City's interests in preventing harassment and intimidation do justify the place restrictions. "As a general matter, it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." *Heffron,* 452 U.S. at 650, 101 S.Ct. at 2565. In protecting such interests, the government is entitled to focus its efforts on solicitation, which "can be distinguished as a particularly intrusive and disruptive form of communication." *ACORN,*

798 F.2d at 1271 n. 13. The Supreme Court has observed that "face-to-face solicitation presents risks of duress that are an appropriate target of regulation." *Lee,* 505 U.S. at 684, 112 S.Ct. at 2708. "As residents of metropolitan areas know from daily experience, confrontation by a person asking for money ... is more intrusive and intimidating than an encounter with a person giving out information." *Kokinda,* 497 U.S. at 733–34, 110 S.Ct. at 3123 (plurality opinion).

The interest in protecting citizens from the harassment and duress of solicitation is most significant in places where citizens cannot easily escape. As noted above in the discussion of public fora, "the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." *Heffron,* 452 U.S. at 650–51, 101 S.Ct. at 2565–66. In this case, the places to be regulated, although likely to be public fora in some instances, share a common characteristic: they are places where people may well have a greater susceptibility to intimidation and harassment than in the open streets or sidewalks. A citizen approached by a solicitor on the street or on a sidewalk may simply decline the solicitation and walk away; by contrast, one eating outside, standing in line for a ticket, waiting for a bus, or proceeding through a parking garage is less likely to be able to move away with ease. The restriction on solicitation within 50 feet of an automated teller machine is also narrowly tailored, as citizens may justifiably feel anxious about being asked for money in these areas. Because the places covered by the challenged restrictions are areas where citizens are more vulnerable to harassment and intimidation, the governmental interest in protecting citizens from such evils takes on greater significance. Since the restrictions are limited to places where harassment and intimidation are more likely to occur, they are narrowly tailored to serve the City's interest in the prevention of such evils.

■ Plaintiffs nonetheless argue that the restrictions are both overbroad and underinclusive, and therefore not sufficiently tailored to survive constitutional scrutiny. Plaintiffs

contend that the regulations are overbroad because they apply to peaceful charities as well as panhandlers. This argument would have some force if the City advanced the prevention of criminal activity and threatened criminal activity as the sole rationale for the restrictions. Common sense indicates that solicitation in general does not necessarily result in criminal activity or cause citizens to fear that a crime is imminent, and the City has submitted no evidence to the contrary. However, as noted above, the City has clearly stated that the prevention of intimidation and harassment are also evils sought to be avoided by the restrictions; even solicitation pursued by peaceful charities carries with it the risk of harassment and, possibly, intimidation. *See Kokinda,* 497 U.S. at 733–34, 110 S.Ct. at 3123–24; *Lee,* 505 U.S. at 684, 112 S.Ct. at 2708–09; *ACORN,* 798 F.2d at 1271 n. 13. Therefore, the inclusion of charitable solicitations does not render the restrictions unconstitutionally overbroad.

 Plaintiffs also argue that the provisions are impermissibly underinclusive, because they apply only to solicitations of donations but not to solicitations of a commercial nature. This argument relates to the second circumstance, alluded to *supra,* in which the underinclusiveness of a speech regulation has been found to be impermissible: where the underinclusiveness "diminish[es] the credibility of the government's rationale for restricting speech in the first place." *ISKCON,* 61 F.3d at 956–57 (citing *Discovery Network,* 507 U.S. at 418–27, 113 S.Ct. at 1510–16).

The Court finds nothing in the record to indicate that the City's decision to regulate only donative solicitation diminishes the credibility of the City's proffered rationales for the regulations. This case is unlike *Discovery Network,* in which the Supreme Court invalidated a regulation which sought to reduce litter on city streets by mandating the removal of newsracks containing commercial handbills, but left newsracks containing newspapers unregulated. Finding no explanation for the city's prohibition against only handbill racks, which represented a small fraction of the overall littering problem,[5] the

Court concluded that the city's unexplained disparate treatment undermined the credibility of its rationale for the restrictions. *Id.* at 424, 113 S.Ct. at 1514. Unlike the plaintiffs in *Discovery Network,* plaintiffs here have not shown that the distinction between commercial and donative solicitation "bears no relationship *whatsoever* to the particular interests that the city has asserted." *Id.* at 424, 113 S.Ct. at 1514 (emphasis in original).

First, the City argues that the solicitation of donations in Santa Monica is frequently accompanied by instances of harassment and intimidation, while commercial solicitation has not, in the City's experience, implicated those same concerns. Second, the City has demonstrated to the Court's satisfaction that it already has in place numerous ordinances which govern commercial solicitation. These existing ordinances impose a variety of time, place, and manner restrictions on commercial solicitors that do not apply to donative solicitors. *See, e.g.,* SMMC Chapter 6.36 (pushcart vendors); SMMC § 6.32.070 (sidewalk vendors); SMMC Chapter 6.32 (door-to-door peddlers); and SMMC §§ 6.36.080, 6.36.105 (street performers). Third, plaintiffs have not alleged that commercial solicitation in the City of Santa Monica presents any of the dangers implicated by the challenged ordinances, nor have they seriously challenged the City's conclusion that donative solicitation often does pose such dangers. While plaintiffs refer the Court to common sense, the Court's sense is that the distinction drawn by the ordinance is a sensible one.

 It may be true, as plaintiffs argue, that the challenged regulations would allow a threatening purveyor of goods to solicit at a bus stop, while preventing a polite panhandler from doing the same. However, "the validity of regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant governmental interests." *ISKCON,* 61 F.3d at 957 (quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2906–07, 86 L.Ed.2d 536 (1985)). The government walks a tight-

---

5. The prohibition resulted in the removal of 62 commercial racks, while leaving 1,500 to 2,000 newspaper racks on the streets. *Id.* at 418, 113 S.Ct. at 1510–11.

rope any time it regulates conduct associated with speech; its regulation must be sufficiently narrow to survive an overbreadth challenge, yet not so narrow as to be suspiciously underinclusive. While Ordinance 1768 may not be perfectly tailored to reach the evils it seeks to regulate, it certainly comes close. The Court finds no merit in plaintiffs' contention that the Ordinance is flawed by an underinclusiveness which diminishes the credibility of the City's rationale for restricting solicitation. *See ISKCON*, 61 F.3d at 956–57.

### C. The Challenged Ordinances Leave Open Ample Alternative Channels for Communication

 Plaintiffs argue that the challenged ordinances inequitably burden the speech of the homeless, as the homeless "disproportionately rely on person-to-person solicitation as a means of communication and survival." Plaintiffs' Motion at 13. However, the challenged ordinances leave open ample alternative channels of communication for solicitors of donations. They do not outlaw face-to-face solicitation in all of the public fora of the City's streets and sidewalks, but merely place reasonable restrictions upon the places and manner in which the homeless and others may engage in such face-to-face solicitation. Plaintiffs argue that the ordinances leave few, if any, places open to solicitation. However, plaintiffs have submitted no evidence to support this contention, nor is it obvious from the underlying facts.

The homeless are not inequitably burdened even if their solicitation is less effective because they depend upon the proscribed practices. The *ACORN* court rejected a similar argument that solicitation from the occupants of vehicles is a *uniquely effective method of* fundraising for which there is no significant alternative. The court held that the plaintiff had no constitutionally protected right to maintain its approach to solicitation based on the theory that a "confined, unwilling audience is more susceptible to undue pressure." *ACORN*, 798 F.2d at 1271 n. 12. Nothing in the challenged regulations prevents solicitors of donations from engaging in face-to-face solicitation on the sidewalks, streets, beach-

es, or parks of the City, as long they do not run afoul of the few place and manner restrictions enacted by the City. If the homeless or others are hampered by their inability to engage in intimidating behavior, or to pressure persons who are not in a position to walk away, this is not a concern of constitutional magnitude.

### D. Defendants Are Entitled to Summary Adjudication on the Constitutionality of the Place Restrictions

 Although defendants have not filed a cross-motion for summary judgment, they argue that this Court may nevertheless grant summary judgment *sua sponte*, pursuant to *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir.1982). Under *Cool Fuel*, it is essential that the moving party have had a full and fair opportunity to provide supporting evidence on the relevant issues. *Cool Fuel*, 685 F.2d at 311.

The Court granted plaintiffs such an opportunity by requesting their input on the relevant issues in its Preliminary Order issued prior to the hearing on this motion, and again by asking plaintiffs to address those issues at the hearing itself. Since the Court still finds no basis for plaintiffs' contention that Ordinance 1768 violates the First Amendment, the Court denies Plaintiffs' Motion for Summary Adjudication and grants summary adjudication in favor of defendants on this issue.

### V. Manner Restrictions

The Court's analysis of the City's place restrictions applies equally to its manner restrictions, subject to the issues discussed below.

 The Court doubts whether some of the manner restrictions implicate the First Amendment at all. *See generally Loper v. New York City Police Dept.*, 999 F.2d 699, 706 (2d Cir.1993) (noting that a Seattle ordinance forbidding aggressive begging "prohibits conduct that extends beyond speech, expression and communication"). Most obviously, the abuse of a person "with words which are offensive and inherently likely to provoke an immediate violent reaction,"

SMMC § 4.54.020(c)(5), is not conduct safeguarded by the Constitution. *See Chaplinsky v. State of New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942) ("fighting" words, which "by their very utterance inflict injury or tend to incite an immediate breach of the peace", are not protected speech). Moreover, the restriction against "touching the solicited person without the solicited person's consent," SMMC § 4.54.020(c)(6), does not involve speech.

■ Like subsections 4.54.020(c)(5) and (6), the City's prohibition against "threatening the person solicited with physical harm by word or gesture," SMMC § 4.54.020(c)(4), appears on its face to involve the type of threat which has "traditionally been punishable without violation of the First Amendment." *Wurtz v. Risley,* 719 F.2d 1438, 1441 (9th Cir.1993); *Roulette v. City of Seattle,* 850 F.Supp. 1442, 1453 (W.D.Wash.1994) (construing *Wurtz* as holding that "threats to cause bodily injury or physical damage to the property of another … are not protected speech"). Yet, to fall outside the scope of First Amendment protection, a threat must have a "reasonable tendency to produce in the victim a fear that the threat will be carried out." *Wurtz,* 719 F.2d at 1441; *see also Roulette,* 850 F.Supp. at 1453 (only those threats "which would make a reasonable person fearful of [the threatened] harm" are not protected by the First Amendment). To the degree the City's prohibition extends to threats that would not make a reasonable person fearful of the threatened harm, it appears to implicate the First Amendment.

■ The three remaining manner restrictions prohibit a solicitor from (1) coming closer than three feet of a person solicited, (2) blocking or impeding a person's passage, or (3) following a person after he declines a solicitation. SMMC §§ 4.54.020(c)(1), (2) and (3). Again, each restriction prohibits only certain physical conduct, not speech. Nevertheless, the fact that this conduct is prohibited by the City only if undertaken "while engaging in solicitation or immediately thereafter," SMMC § 4.54.020(c), suggests that some speech concerns may be implicated by the City's restrictions. For example, these activities could be viewed as expressive conduct, the regulation of which is subject to First Amendment scrutiny. *See United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

■ However, even when the Court treats the six manner restrictions as subject to First Amendment scrutiny, it finds them to be valid time, place or manner regulations. First, as with the place regulations, plaintiffs have presented no evidence which indicates that the City's manner regulations discriminate based on the viewpoint of the speaker or the content of the speech; all individuals or groups who solicit donations must do so without resorting to certain forms of threat or intimidation, regardless of what message, if any, they are trying to convey. Thus, the manner restrictions are "justified without reference to the content of the regulated speech." *Community for Creative Non–Violence,* 468 U.S. at 293, 104 S.Ct. at 3069.

■ Second, the manner restrictions are narrowly tailored to achieve the City's interest in preventing intimidating, threatening, and harassing conduct. The prevention of such conduct is a significant governmental interest, and application of the manner regulations to "peaceful charities" as well as panhandlers does not render them overbroad.

■ Third, and finally, the City's manner regulations leave open ample alternative channels for communicating information. *See Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55. The regulations do not restrict the communication of ideas through the distribution of literature or the making of speeches at any location in the City. They do not even limit panhandling, unless and until the solicitor engages in overly aggressive behavior which in some instances would subject him or her to criminal sanctions. The Court accordingly denies plaintiffs' motion for summary judgment, and grants summary adjudication to defendants.[6]

---

6. The Court notes that, as with the place restrictions, plaintiffs were given ample opportunity, pursuant to *Cool Fuel, supra,* to submit evidence on this issue.

## VI. The Challenged Provisions Do Not on Their Face Vest Excessive Discretion in Law Enforcement Officials

 The Court finds no merit in plaintiffs' argument that the challenged ordinances "clearly and unambiguously invest too much discretion in law enforcement officials." Reply at 12. Plaintiffs cite several cases in which state officials were given "unguided and unlimited discretion" in deciding whether to grant or deny licenses or permits. *E.g. Cantwell v. Connecticut,* 310 U.S. 296, 307, 60 S.Ct. 900, 904–05, 84 L.Ed. 1213 (1940); *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 629, 100 S.Ct. 826, 832, 63 L.Ed.2d 73 (1980); *Discovery Network, Inc.,* 507 U.S. at 415, 113 S.Ct. at 1509. As distinguished from the regulations at issue in those cases, Santa Monica's regulations provide clear and concise guidelines to channel the discretion of law enforcement personnel, from defining precisely how closely a solicitor may approach a potential donor to listing the precise sites where solicitation is prohibited. If plaintiffs wish to challenge the application of the ordinances, they may do so, but the Court finds nothing on the face of the regulations which vests undue discretion in law enforcement officials. The Court accordingly grants summary adjudication to defendants on this issue.

## CONCLUSION

The Court DENIES plaintiffs' motion for summary adjudication, and GRANTS summary adjudication in favor of defendants, as to the constitutionality of Ordinance No. 1768, SMMC ch. 4.54, §§ 4.54.010–4.54.040 (1994). In light of plaintiffs' lack of standing to challenge the constitutionality of Ordinance 1758, SMMC ch. 4.08, § 4.08.750, the Court expresses no opinion on that regulation's constitutionality.

**IT IS SO ORDERED.**